UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION

LARRY R. BROWN                                    CIVIL ACTION NO. 3:14-cv-3538
     LA. DOC #300100

                                                           SECTION P

VS.

                                                          JUDGE ROBERT G. JAMES

BURL CAIN, WARDEN, LOUISIANA
STATE PENITENTIARY                           MAGISTRATE JUDGE HAYES

<u>REPORT AND RECOMMENDATION</u>

    *Pro se* Petitioner Larry R. Brown, a prisoner in the custody of Louisiana's Department of

Corrections, filed the instant Petition for writ of *habeas corpus* pursuant to 28 U.S.C. § 2254 on

December 29, 2014.  [doc. # 1].  Petitioner attacks his second degree murder conviction and the

life sentence imposed by the Sixth Judicial District Court, East Carroll Parish.  This matter has

been referred to the undersigned for review, report, and recommendation in accordance with the

provisions of 28 U.S.C. § 636 and the standing orders of the Court.

<u>Background</u>

    The underlying facts in this case have been set forth by the Louisiana Second Circuit

Court of Appeal as follows:

> On the night of November 12, 2008, Gerald King ("King") was shot and killed while
> sitting in his car outside Uncle Darrell's Mini Market ("Uncle Darrell's") in East
> Carroll Parish. Several people standing nearby witnessed the murder and stated that
> the defendant, Brown, walked up to the driver's side window of the vehicle where
> King sat and fired a small black revolver into the vehicle several times. Police
> arrested Brown at his aunt's house without incident the following day.
>
> Brown was charged by bill of indictment with one count of second degree murder.
> Subsequently, Brown filed notice that he intended to produce evidence suggesting
> that others had a motive to kill King. The trial court ruled that such evidence would
> not be admissible unless the defendant was able to establish a sufficient foundation
> for the admission of character evidence during trial.

> Brown later filed a motion to recuse Judge Crigler claiming that Judge Crigler would be unable to remain impartial because the victim's mother had volunteered to assist with the judge's election campaign. After a hearing, the motion to recuse was denied.
>
> Jury selection began on October 11, 2010. During *voir dire*, 14 of Brown's challenges for cause were denied, and Brown used all of his peremptory challenges before the jury was seated. On October 12, 2010, Brown filed a motion for change of venue arguing that the responses given by potential jurors during *voir dire* indicated that the level of pretrial publicity would deny him a fair and impartial jury. After a hearing, the trial court denied Brown's motion for change of venue.
>
> The jury trial began on October 13, 2010, and lasted two days. On October 15, 2010, the jury returned from deliberation with a verdict of guilty of second degree murder. Brown waived sentencing delay, and the trial court sentenced him to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence.

*State v. Brown*, 86 So. 3d 726, 729-30 (La. App. 2 Cir. 2012). The appellate court affirmed Petitioner's conviction and sentence on February 29, 2012. *Id.* at 741. The Louisiana Supreme Court denied Petitioner's subsequent application for writ of certiorari on September 14, 2012. *State v. Brown*, 97 So. 3d 1016 (La. 2012). Petitioner did not seek further direct review before the United States Supreme Court.

Petitioner filed a *pro se* application for post-conviction relief in the trial court on September 25, 2013. [doc. # 1-3, p. 21]. The trial court denied relief on November 20, 2013. *Id.* at 42. The Second Circuit Court of Appeal denied Petitioner's application for supervisory review on January 29, 2014. *Id.* at 58. The Louisiana Supreme Court, on October 24, 2014, likewise denied Petitioner's application. *Id.* at 95.

Petitioner filed the instant Petition on December 29, 2014. [doc. # 1]. He raises the following assignments of error: (1) the trial court erroneously excluded evidence of the victim's criminal history; (2) the trial court erroneously denied Petitioner's motion to recuse; (3) the trial

court erroneously denied Petitioner's motion for change of venue; (4) the trial court erroneously

denied Petitioner's challenges for cause at *voir dire*; (5) the trial court erroneously admitted

gruesome photographs; (6) the trial court erroneously permitted the State to "re-use exhibits

previously marked with stickers by prior witnesses"; (7) insufficient evidence; and (8) ineffective

assistance of counsel.  [doc. # 1-1].  The matter is now before the Court.

## Law and Analysis

### I.        Standard of Review – 28 U.S.C. § 2254

The Antiterrorism and Effective Death Penalty Act ("AEDPA") of 1996, 28 U.S.C. §

2254, governs *habeas corpus* relief.  The AEDPA limits how a federal court may consider

*habeas* claims.  After the state courts have "adjudicated the merits" of an inmate's complaints,

federal review "is limited to the record that was before the state court[.]"  *Cullen v. Pinholster*,

131 S. Ct. 1388, 1398 (2011).  An inmate must show that the adjudication of the claim in state

court:

> (1) resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the Supreme Court
> of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the
> facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).

A decision is "contrary to" clearly established Federal law "if the state court arrives at a

conclusion opposite to that reached by . . . [the Supreme Court] on a question of law or if the

state court decides a case differently than [the Supreme Court] has on a set of materially

indistinguishable facts."  *Dowthitt v. Johnson*, 230 F.3d 733, 740-41 (5th Cir. 2000) (quoting

*Williams v. Taylor*, 529 U.S. 362 (2000)).  "The 'contrary to' requirement refers to holdings, as opposed to the dicta, of . . . [the Supreme Court's] decisions as of the time of the relevant state-court decision."  *Id.* at 740.  Under the "unreasonable application" clause, a federal *habeas* court may grant the writ only if the state court "identifies the correct governing legal principle from . . . [the Supreme Court's] decisions but unreasonably applies the principle to the facts of the prisoner's case."  *Id.* at 741.

Section 2254(d)(2) speaks to factual determinations made by the state courts.  Federal courts presume such determinations to be correct; however, a petitioner can rebut this presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

## II.   Petitioner's Claims

A. Claim One: Exclusion of Evidence

Petitioner first claims that the trial court prohibited him from presenting a complete defense when it erroneously excluded evidence of the victim's criminal history.[1]  [doc. # 1-1 p. 13].  He explains that he "sought to introduce the evidence solely to demonstrate what motives others may have had to kill" the victim.  *Id.*

On September 29, 2010, at a pre-trial hearing, the State moved "to prohibit the defendant from using any information he gained in the victim's criminal history to attack the character of the victim."  [doc. # 12-7, p. 99].  Defense counsel responded that there were others with a motive to kill the victim and that the defense "ought to be able to bring out . . . the reasons why perhaps somebody else may want to harm [the victim]."  *Id.* at 100.  Defense counsel argued further, "We are not going to attack the credibility," and "We're not gonna [sic] attack anything

---

[1] Petitioner does not present the evidence that the trial court allegedly erred in excluding.

4

that tend[s] to perhaps demean the decedent." *Id.*  The trial court granted the State's oral motion and ruled:

> [T]he character of the victim is not at issue.  And therefore, absence [sic] some proof raising character brought by the State, then there would not be, you cannot, the Court would not admit evidence about the criminal history of the victim. Now, if an independent basis comes up during trial for admission of information concerning the criminal history of the victim, the Court would consider that. . . . But, I'm not saying that there couldn't be relevant evidence developed through questions that I can't foresee at the current time.  So I'm not saying that there's absolutely no way that there could be evidence of the victim's criminal history.  But it would have to be something that was developed and there was a foundation laid for it at trial.

*Id.* at 101.

The right to present a complete defense under the Sixth Amendment "is an essential attribute of the adversary system . . . ." *Taylor v. Illinois*, 484 U.S. 400, 408 (1988).  "However, this right is limited and must be weighed against the countervailing interests in 'the integrity of the adversary process . . . the interest in the fair and efficient administration of justice, and the potential prejudice to the truth-determining function of the trial process.'" *U.S. v. Mizell*, 88 F.3d 288, 294 (5th Cir. 1996) (citing *Taylor*, 484 U.S. at 414-15).  "[R]ules excluding evidence from criminal trials . . . do not abridge an accused's right to present a defense so long as they are not arbitrary or disproportionate to the purposes they are designed to serve." *U.S. v. Scheffer*, 523 U.S. 303, 308 (1998) (internal quotations omitted); *see also U.S. v. John*, 597 F.3d 263, 277 (5th Cir. 2010) ("[T]he accused . . . must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence.").  In *Nevada v. Jackson*, 133 S. Ct. 1990, 1992 (2013), the Supreme Court stated that it has rarely "held that the right to present a complete defense was violated by the exclusion of defense evidence under a state rule of evidence."

5

Here, the trial judge clearly determined that the evidence Petitioner sought to admit was irrelevant.  In Louisiana, under LA. CODE EVID. ANN. art. 402,  "Evidence which is not relevant is not admissible."  Petitioner fails to argue that Article 402—or any Louisiana evidentiary rule for that matter—is arbitrary or disproportionate to the purpose it serves.  If Petitioner wishes to succeed by challenging the trial judge's application of Article 402, he would first have to demonstrate that the trial judge's ruling was erroneous and he would then have to show that the ruling rendered his trial fundamentally unfair.  *See Johnson v. Puckett*, 176 F.3d 809, 820 (5th Cir. 1999).

That in mind, Petitioner fails to show that the trial judge's ruling was erroneous.  Even assuming that the trial judge's ruling was erroneous, Petitioner fails to show that the ruling rendered his trial fundamentally unfair.[2]  Accordingly, the appellate court's denial of this claim was not contrary to, or an unreasonable application of, clearly established federal law.  This claim should be **DENIED**.

B. Claim Two: Denial of Petitioner's Motion to Recuse

Next, Petitioner claims that the trial court erroneously denied his motion to recuse the trial judge.  [doc. # 1-1, p. 14].  In the motion, Petitioner argued that the "victim's mother coordinated, distributed signs, and engaged the services of others towards the re-election campaign of the Judge . . . ."  [doc. #12-5, p. 49].  He also argued that the victim's sister "participated and played a personal role in the [judge's] re-election bid . . . ."  *Id.*  He argued

---

[2] This is especially true considering that "the Constitution leaves to [trial] judges . . . 'wide latitude' to exclude evidence that is . . . 'only marginally relevant' . . . ."  *See Crane v. Kentucky*, 476 U.S. 683, 689 (1986) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)).

further that the information was public knowledge and that it would "hinder [his] prospect of [an] impartial trial" and "unduly influence the jurors . . . ." *Id.* The appellate court construed and analyzed Petitioner's claim thusly:

> [T]he defendant has asserted the victim's mother and grandmother worked on Judge Crigler's election campaign two years prior to the trial. There is no indication that Judge Crigler had any knowledge of their involvement in his election campaign. Furthermore, as the trial court on the motion for recusal found, Judge Crigler had administered several trials since his election campaign involving members of the King family. One such trial resulted in a term of life imprisonment for a member of the King family. Brown failed to prove that Judge Crigler would be biased, prejudiced, or personally interested in the cause to such an extent that he would be unable to conduct a fair and impartial trial. It was not error for the trial court to deny the motion.

*Brown*, 86 So. 3d at 735.

It is well-settled that, under the Due Process Clause of the Constitution, the accused in any criminal trial is guaranteed the right to a fair and impartial tribunal.[3] *Nethery v. Collins*, 993 F.2d 1154, 1157 (5th Cir. 1993); *Bracy*, 520 U.S. at 905; *In re Murchison*, 349 U.S. 133, 136 (1955). The Due Process Clause "establishes a constitutional floor, not a uniform standard." *Bracy*, 520 U.S. at 904. Bias is not lightly established because, ordinarily, courts "presume that public officials have properly discharged their official duties." *Bigby v. Dretke*, 402 F.3d 551, 558 (5th Cir. 2005) (citing *Valley v. Rapides Parish S.B.*, 118 F.3d 1047, 1052 (5th Cir. 1997); *Bracy*, 520 U.S. at 909). "General allegations of bias or prejudice are insufficient to establish a

_____

[3] A trial judge's disqualification under a state statute or code of judicial conduct does not ordinarily implicate the Constitution. *Bracy v. Gramley*, 520 U.S. 899, 904-05 (1997); *Nichols v. Scott*, 69 F.3d 1255, 1277 (5th Cir. 1995) (citing *U.S. v. Couch*, 896 F.2d 78, 81 (5th Cir. 1990) (noting that the federal statutory disqualification standard is "more demanding than that required by the Due Process Clause . . . .")); *Fero v. Kerby*, 39 F.3d 1462, 1479-80 (10th Cir. 1994). "Generally, the constitutional due process requirements regarding judicial impartiality are much narrower than the requirements found in recusal statutes and ethical canons." *Richardson v. Quarterman*, 537 F.3d 466 n.4 (5th Cir. 2008).

constitutional violation." *Richardson*, 537 F.3d at 474.

"Fairness of course requires an absence of actual bias in the trial of cases.  But our system of law has always endeavored to prevent even the probability of unfairness."  *In re Murchison*, 349 U.S. at 136.  The United States Supreme Court "has recognized two kinds of judicial bias: actual bias and presumptive bias."  *Buntion v. Quarterman*, 524 F.3d 664, 672 (5th Cir. 2008) (citations omitted).  "Presumptive bias occurs when a judge may not actually be biased, but has the appearance of bias such that 'the probability of actual bias . . . is too high to be constitutionally tolerable.'"  *Richardson*, 537 F.3d at 476 (quoting *Buntion*, 524 F.3d at 672)). "There are three situations in which the Supreme Court has found presumptive bias: '(1) the decision maker has a direct personal, substantial, and pecuniary interest in the outcome of the case; (2) an adjudicator has been the target of personal abuse or criticism from the party before him; and (3) a judicial or quasi judicial decision maker has the dual role of investigating and adjudicating disputes and complaints.'"  *Buntion*, 524 F.3d at 672 (quoting *Bigby*, 402 F.3d at 559).

Here, Petitioner does not claim, and the record does not reveal, that the trial judge was actually biased.  In fact, on October 8, 2010, at a hearing on the matter, the victim's sister indicated that the trial judge was not aware of either her or her mother's involvement in the campaign.  [doc. # 12-11, p. 144-45].  This connection to the trial judge is, ultimately, too remote and insubstantial to violate the Due Process Clause.

Rather than claiming actual bias, Petitioner claims that the victim's family's involvement in the judge's campaign "creates, at least, the appearance of impropriety . . . ."  [doc. # 1-1, p. 15].  To that end, "There is no clearly established law determined by the Supreme Court

indicating that the mere appearance of bias in a trial judge such as to mandate recusal under state law constitutes a violation of the Due Process Clause, and requires automatic reversal . . . ." *Richardson*, 537 F.3d at 478.  To the extent that Petitioner claims the judge was presumptively biased, the family's connection to the judge's campaign does not approximate the factual underpinnings of the clearly established Supreme Court cases finding presumptive bias.  The trial judge did not have a pecuniary interest in the case, he was not the target of personal abuse or criticism from any party before him, and he did not have the dual role of investigating and adjudicating the dispute.  *See Richardson*, 537 F.3d at 477 ("[T]he appearance of bias in a judge does not necessarily amount to presumptive bias.").  Thus, the trial judge was not impermissibly biased.  *See Richardson*, 537 F.3d at 475 (holding that a judge was not presumptively biased where his wife was an acquaintance of the victim).

The appellate court's ruling was not contrary to, or an unreasonable application of, clearly established federal law.  This claim should be **DENIED**.

C. Claim Three: Denial of Petitioner's Motion for Change of Venue

Petitioner claims that the trial court erroneously denied his motion for change of venue in light of extensive pre-trial publicity.  [doc. # 1-1, p. 16].  He argues that the "prejudice in the mind of the public was sufficient to prevent [him] from obtaining an impartial jury and a fair trial."  *Id.*  He argues further, "With the level of notoriety and public attention this case commanded, prejudice or influence existed within the community at large that affected the jurors' answers during voir dire."  *Id.*  The appellate court set forth the applicable background, as well as its ruling, as follows:

Upon review of the record, it appears that Brown failed to introduce any newspaper

articles or other evidence concerning pretrial publicity or public opinion. The trial court based its decision solely on the responses given by prospective jurors during voir dire. The trial court noted that it "did not have that feeling of high electricity that you have sometimes when there is a lot of public sentiment about a case." In addition, the trial court pointed out that prospective jurors appeared relaxed; a significant amount of time had passed since the murder and the trial; and, Brown did not have any special notoriety. We do not find a substantial basis for a finding that Brown was unable to receive a trial free and unfettered by outside influences. While some of the jurors mentioned that they had read about the incident in the local newspaper, all of these jurors indicated that the articles would have no bearing on their ability to remain impartial. This assignment of error is without merit.

*Brown*, 86 So. 3d at 736.

Here, to the extent that Petitioner faults the trial court for failing to grant his motion for change of venue, Petitioner's claim does not involve consideration of any federal or constitutional law.  "Federal habeas corpus relief will not issue to correct errors of state constitutional, statutory, or procedural law unless a federal issue is also presented." *Leblanc v. Quarterman*, 2008 WL 2330746 at *6 (N.D. Tex. 2008); *West v. Johnson*, 92 F.3d 1385, 1404 (5th Cir. 1996).  Rather, "[f]ederal habeas corpus review is limited to errors of constitutional dimension . . . ." *Castillo v. Johnson*, 141 F.3d 218, 222 (5th Cir. 1998).  In the course of reviewing state proceedings, a federal court does not sit as a super state appellate court. *Dillard v. Blackburn*, 780 F.2d 509, 513 (5th Cir. 1986).  Here, consequently, review of this claim is not proper.

To the extent Petitioner claims he was denied a fair trial due to the pre-trial publicity, his claim should be denied as conclusory and speculative.  Initially, the Court observes that Petitioner fails to highlight any particular *voir dire* testimony indicating juror bias resulting from community awareness of the crime.  In this respect, he essentially asks the Court to presume bias.

When a petitioner fails to direct the court to specific portions of the record indicating

juror bias and instead relies on extensive media coverage, the petitioner must demonstrate that the trial atmosphere was "utterly corrupted by press coverage." *Dobbert v. Florida*, 432 U.S. 282, 303 (1977). The "principle of presumptive prejudice is only rarely applicable and is confined to those instances where the petitioner can demonstrate an extreme situation of inflammatory pretrial publicity that literally saturated the community in which his trial was held." *Busby v. Dretke*, 359 F.3d 708, 725 (5th Cir. 2004) (citing *Mayola v. State of Ala.*, 623 F.2d 992, 997 (5th Cir. 1980)).

Here, Petitioner fails to present any evidence indicating that pre-trial media coverage corrupted the atmosphere in the community. As the Second Circuit noted, "Brown failed to introduce any newspaper articles or other evidence concerning pretrial publicity or public opinion." *Brown*, 86 So. 3d at 736. This claim should be **DENIED**. *See Ross v. Estelle*, 694 F.2d 1008, 1011 (5th Cir. 1983) ("Absent evidence in the record, a court cannot consider a habeas petitioner's bald assertions on a critical issue . . . unsupported and unsupportable by anything else contained in the record, to be of probative evidentiary value.").

D. Claim Four: Denial of Petitioner's Challenges for Cause

Petitioner claims that the trial court erroneously denied his challenges for cause at *voir dire* with respect to the following prospective jurors: (1) Linda R. Martin; (2) Tiffany Nicole T. Moody; (3) Sheila W. Marshall; (4) Jacqueline B. Threats; (5) Shirley B. Peeler; (6) Betty S. Lee; (7) Ashley N. Turner; (8) Joseph B. Ross; (9) Frankie J. Stanfield; (10) Frances Amacker; (11) Robert B. Holt; (12) Kelvin J. Lane; (13) Sandra B. Campbell; and (14) Shirley M. Holden. [doc. # 1-1, p. 17-20]. He contends that, in so doing, the trial court forced him to exhaust his allotted peremptory strikes. *Id.*

11

When a trial court denies a challenge for cause "'the inquiry turns not on the . . . court's alleged failure to remove for cause certain prospective jurors, but rather on whether the jurors who ultimately sat were impartial.'" *Holiday v. Stephens*, 587 Fed. App'x 767, 787 (5th Cir. 2014) (citing *U.S. v. Snarr*, 704 F.3d 368, 386 (5th Cir. 2013)).[4]  Here, out of the fourteen prospective jurors, only Linda R. Martin and Shirley M. Holden actually served on Petitioner's jury.  [doc. #s 12-6, p. 142-43; 12-12, p. 320-22].  Thus, the Court need only decide whether the trial court erroneously refused to dismiss these two jurors.

The Sixth Amendment guarantees criminal defendants the right to an impartial and indifferent jury.  *Morgan v. Illinois*, 504 U.S. 719, 726-27 (1992).[5]  "[T]he presence of a biased juror may require a new trial as a remedy."  *Hatten v. Quarterman*, 570 F.3d 595, 600 (5th Cir. 2009).  "A juror is biased if his 'views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'"  *Id.* (quoting *Soria v. Johnson*, 207 F.3d 232, 242 (5th Cir. 2000)); *U.S. v. Wharton*, 320 F.3d 526, 535 (5th Cir. 2003) (citing the same standard when a defendant claimed that the district court erred in denying his challenge for cause).

---

[4] "The reasoning behind this approach is that peremptory challenges—which simply are a means to achieve the end of an impartial jury—often cure errors purportedly committed when trial courts refuse to grant challenges for cause.  Because peremptory challenges are not of constitutional dimension . . . the fact that the defendant had to use a peremptory challenge to achieve [an impartial jury] does not mean the Sixth Amendment was violated.  Indeed, the Supreme Court expressly has held that a defendant's exercise of peremptory challenges . . . is not denied or impaired when the defendant chooses to use a peremptory challenge to remove a juror who should have been excused for cause."  *Snarr*, 704 F.3d at 386 (internal quotation marks and citations omitted).

[5] "In any trial, there is initially a presumption of jury impartiality."  *U.S. v. O'Keefe*, 722 F.2d 1175, 1179 (5th Cir. 1983).

There are two recognized variations of bias.  *Hatten*, 570 F.3d at 600.  "Actual bias exists when the juror failed to answer a material question honestly on voir dire, and a correct response would have provided a valid basis for a challenge for cause."  *Id.*  "In the majority of situations, the party seeking a new trial must demonstrate bias through admission or factual proof."  *U.S. v. Bishop*, 264 F.3d 535, 554 (5th Cir. 2001).  "There is also a narrow class of relationships described by Justice O'Connor's concurrence in *Smith v. Phillips*, and recognized by [the Fifth Circuit] on several occasions, for which a juror can be presumed biased."  *Hatten*, 570 F.3d at 600 (citing *Solis v. Cockrell*, 342 F.3d 392, 395 (5th Cir. 2003)).

In *Smith*, Justice O'Connor listed several extreme situations that would justify finding implied bias: "a revelation that the juror is an actual employee of the prosecuting agency, that the juror is a close relative of one of the participants in the trial or the criminal transaction, or that the juror was a witness or somehow involved in the criminal transaction."  *Smith v. Phillips*, 455 U.S. 209, 948 (1982).  Justice O'Connor's opinion is only illustrative.  *See Brooks v. Dretke*, 444 F.3d 328, 330 (5th Cir. 2006) ("The implied bias doctrine neither starts [nor] ends with the Supreme Court's decision in *Smith v. Phillips*.").  There is no definitive test; the inquiry is fact-specific.  That said, in *Andrews v. Collins*, 21 F.3d 612, 620 (5th Cir. 1994), the Fifth Circuit emphasized that the Supreme Court "has not looked favorably upon attempts to impute bias to jurors," and that only "*extreme situations*" would justify such a finding.  *See Solis*, 342 F.3d at 396 (noting that the Fifth Circuit recognizes the implied bias doctrine "with carefully watched limits.").

Here, Petitioner does not claim that any prospective juror evinced actual bias.  Instead, he tacitly claims that the jurors were impliedly bias.  At *voir dire*, prospective juror Linda R. Martin

13

testified that she taught the victim's children and that the victim "used to bring [the children] in the school everyday."  [doc. # 12-11, p. 219].  However, she further testified that she was not close with the victim and that her prior experience with him would not affect her ability to be fair to the defendant and the State.  *Id.* at 220.  She also stated that the jurors "should be fair" and "listen to both sides."  *Id.* at 232.

Prospective juror Shirley Holden disclosed that her husband "does transportation for the Sheriff [sic] Department."  [doc. # 12-12, p. 260].  She also disclosed that she worked with the East Carroll Parish School System and that she knew the victim "as a student at the junior high school."  [doc. # 12-12, p. 259, 270].  When asked whether her knowledge of the victim would have any affect on her ability to be fair, Holden responded, "No."  *Id.* at 271.  Holden communicated further that she read about the crime in the newspaper, but that she could not remember anything about it and that she did not form an opinion about the defendant's guilt or innocence.  *Id.* at 280.  Finally, when asked, "have you heard anything that would make you not be able to be fair and impartial and judge the evidence," Holden responded, "No, I haven't."  *Id.* at 292.[6]

The two jurors' experiences and relationships are not equivalent to the extreme situations that Justice O'Connor listed in *Smith.*  Neither juror was an employee of the prosecuting agency, a close relative of one of the participants in the trial or the criminal transaction, a witness to the crime, or a participant in the crime.  In addition, unlike in other cases where courts found implied

---

[6]  Petitioner does not claim, and offers no evidence to suggest, that any of the *voire dire* testimony was false.

bias when jurors deliberately failed to disclose information, the two prospective jurors here voluntarily disclosed the information that Petitioner relies on in claiming bias.

This is not one of the rare circumstances in which a finding of implied juror bias is warranted. The two jurors' incidental connections to the victim, ultimately, do not "inherently create . . . a substantial emotional involvement, adversely affecting [their] impartiality." *See Solis*, 342 F.3d at 392. In the same way, Juror Holden's admitted connection to law enforcement is not a sufficient basis for imputing bias. *Compare U.S. v. Bryant*, 991 F.2d 171, 174 (5th Cir. 1993) (holding that the defendant was not entitled to have a juror, who responded that she could be fair and whose husband had been the chief of police in a neighboring city for 21 years, excused for cause), *and Wiley v. Grimmer*, 476 Fed. App'x 292, 293-94 (5th Cir. 2012) (rejecting a claim of juror bias where a juror was "entirely forthcoming" with his relationship to the sheriff) *with Biagas v. Valentine*, 265 Fed. App'x 166, 172 (5th Cir. 2008) (counsel ineffective for failing to strike juror who worked for the local sheriff's office and who stated, "I'm going to be partial.").

Both prospective jurors disclosed their relatively remote connections to the case. Then, in response to the trial judge's questioning, both swore that they would deliver a verdict according to the law and evidence. [doc. # 12-12, p. 320, 322]. None of the *voir dire* testimony indicates that the jurors' indirect relationships would have prevented or substantially impaired the performance of their duties as jurors. The circumstances at issue are, therefore, beyond the "carefully watched limits" of the implied bias doctrine. *See, e.g., U.S. v. Flores*, 63 F.3d 1342, 1357-58 (5th Cir. 1995) (trial court did not abuse its discretion in declining to excuse venire members who were acquainted with government witnesses or members of law enforcement).

Petitioner fails to demonstrate that the appellate court's ruling was contrary to, or an unreasonable application of, clearly established federal law.  This claim should be **DENIED**.

E. Claim Five: Prejudicial Photographs

Petitioner claims that the trial court erroneously admitted gruesome, prejudicial photographs depicting the deceased victim at the scene of the crime.  [doc. # 1-1, p. 21].  The Court, however, can discern no constitutional allegation.  "In habeas actions, [a federal court] does not sit to review the mere admissibility of evidence under state law." *Little v. Johnson*, 162 F.3d 855, 862 (5th Cir. 1998); *see Estelle v. McGuire*, 502 U.S. 62, 67 (1991) ("[F]ederal habeas corpus relief does not lie for errors of state law.").  Because Petitioner fails to allege any actual constitutional violation, this claim is not cognizable.

To be sure, "a state trial court's evidentiary rulings will mandate habeas relief when errors are so extreme that they constitute a denial of fundamental fairness.  Thus, only when the wrongfully admitted evidence has played a crucial, critical, and highly significant role in the trial will habeas relief be warranted." *Little*, 162 F.3d at 862 (citations omitted).  Here, even if Petitioner could show that the photographs were erroneously admitted under Louisiana law, he has not shown that the admission of the photographs played a crucial, critical, or highly significant role in Petitioner's conviction.  This claim should be **DENIED**.

F. Claim Six: Reuse of Exhibits

Petitioner claims that the "trial court erred in permitting the State to repeatedly re-use exhibits previously marked with stickers by prior witnesses."  [doc. # 1-1, p. 23].  He argues that the trial court "violated the very spirit and purpose of the rule of sequestration."  [doc. # 1-1, p. 24].  The appellate court construed and analyzed Petitioner's claim as follows:

16

Brown argues that allowing a witness to observe a demonstrative marked by a prior witness is the equivalent of allowing that witness to sit in the courtroom and listen to the testimony of the previous witness. Brown claims that it will never be clear to what extent the testimony of each subsequent witness is affected by viewing the placement of stickers by previous witnesses and, therefore, the trial court's error materially prejudiced his case. We disagree.

Sequestration of witnesses is governed by La. C.E. art. 615(A) which states:

> As a matter of right. On its own motion the court may, and on request of a party the court shall, order that the witnesses be excluded from the courtroom or from a place where they can see or hear the proceedings, and refrain from discussing the facts of the case with anyone other than counsel in the case. In the interests of justice, the court may exempt any witness from its order of exclusion.

The purpose of sequestration is to assure that a witness testifies as to his own knowledge, to prevent witnesses from being influenced by the testimony of others, and to strengthen the role of cross-examination in developing facts.  The injured party must prove, by a preponderance of the evidence, that a sequestration order violation occurred and that the violation materially prejudiced his case. In examining sequestration violations, the reviewing court considers the facts of each case to determine whether or not prejudice resulted.

Here, the state introduced several large photographs which they used to assist witness testimony: state's exhibit 5 depicted the front of Uncle Darrell's where the shooting took place; state's exhibit 6 depicted the 20/20 Club across the street from Uncle Darrell's; and, state's exhibit 8 was a large map of the area surrounding the scene of the shooting. On direct examination, the state instructed Puckett, Davis, and Powell, respectively, to place a sticker with their initials on state's exhibit 5 in order to indicate where they were standing at the time of the shooting and another sticker to indicate where King's car was located when the shooting occurred. On direct examination, the state instructed Carter to place a sticker with his initials on exhibit 6 to indicate the location where he picked up Brown and to place a sticker on exhibit 8 to indicate where the accident took place following the shooting.

Each successive witness had an opportunity to view the location that previous witnesses claimed to have been standing or claimed the victim to have been located. Although it does not appear that a witness could have known which question the previous witnesses' stickers were in response to, a review of the record indicates that the state referred witnesses to specific stickers on exhibits that previous witnesses had marked during direct examination. Even if the state's use of the demonstratives violated the sequestration order, it does not appear that the violation materially

17

> prejudiced the defendant's case. The suggestiveness of the demonstratives was not to the level that would allow a witness to fully fabricate significant testimony. Witness testimony, unaffected by the use of the demonstratives, was sufficient to support a conviction of second degree murder. The prejudice to the defendant was not material; therefore, it does not warrant reversal or remand.

*Brown*, 86 So. 3d at 739-41 (internal citations omitted).

Here, the Court initially observes that Petitioner fails to raise a claim of constitutional magnitude.  A claim "that the trial court failed to invoke the rule of sequestration of witnesses does not raise a question that can be reached by federal habeas corpus, since such denial does not amount to a deprivation of appellant's constitutional rights."  *Mathis v. Wainwright*, 351 F.2d 489 (5th Cir. 1965); *see Passman v. Blackburn*, 652 F.2d 559, 569 (5th Cir. 1981) (holding that the alleged violation of the sequestration rule "does not of itself raise federal constitutional questions cognizable in habeas corpus."); *Pollard v. Cain*, 2007 WL 4299991, at *15 (W.D. La. Nov. 9, 2007) (noting that a complaint that a trial court failed to invoke the rule of sequestration does not amount to a deprivation of constitutional rights).

Even assuming Petitioner's claim does raise constitutional concerns, Petitioner fails, for the reasons set forth by the appellate court, to demonstrate prejudice sufficient to warrant relief.[7] *See Blackmon v. Johnson*, 145 F.3d 205, 211 (5th Cir. 1998) (holding that even if the trial court erred in not sequestering witnesses, the petitioner did not demonstrate the requisite prejudice).  In the same way, Petitioner does not establish that the alleged trial court error rendered his trial fundamentally unfair.  *See Floyd v. Scott*, 29 F.3d 623 (5th Cir. 1994) (holding that a petitioner who claimed that witnesses testified in violation of the rule of sequestration failed to demonstrate

---

[7] Instead of articulating the prejudice he suffered, Petitioner vaguely suggests, "It will never be clear to what extent the testimony of each subsequent witness is affected by seeing the placement of stickers by previous witnesses."  [doc. #s 1-1, p. 25; 14, p. 8].

that the violation constituted a denial of fundamental fairness).  This claim should be **DENIED**.

G. Claim Seven: Insufficient Evidence

Petitioner claims that the evidence presented at trial was insufficient to find him guilty of the charged crime.  [doc. # 1-1, p. 26].  He argues, in particular, that the State failed to "negate any reasonable probability of misidentification."  [doc. # 1-1, p. 26].

When a *habeas* petitioner asserts that the evidence presented was insufficient to support his conviction, the limited question is whether the state appellate court's decision to reject that claim was an objectively unreasonable application of the clearly established federal law set out in *Jackson v. Virginia*, 443 U.S. 307 (1979).  *Williams v. Puckett*, 283 F.3d 272, 278-79 (5th Cir. 2002).  A conviction is based on sufficient evidence if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319.  The *Jackson* inquiry "does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit."  *Herrera v. Collins*, 506 U.S. 390, 402 (1993).  Thus, a conviction may rest on sufficient evidence "even though the facts also support one or more reasonable hypotheses consistent with the defendant's claim of innocence."  *Gibson v. Collins*, 947 F.2d 780, 783 (5th Cir. 1991).

Here, invoking *Jackson*, the Second Circuit Court of Appeal began review by referencing the pertinent definition of second degree murder found in La. Rev. Stat. § 14:30.1: "Second degree murder is the killing of a human being: (1) When the offender has a specific intent to kill or to inflict great bodily harm."  *Brown*, 86 So. 3d at 730.  The court then summarized the relevant evidence presented at trial:

19

Antonio Davis testified that he was present at Uncle Darrell's when the shooting occurred. Davis testified that on the night of the shooting, his vehicle was parked near the entrance to Uncle Darrell's on the north side of the building. According to Davis, he was standing by the driver's side door of his vehicle talking with someone while his girlfriend made purchases inside the store. Davis further explained that King's vehicle was parked several feet away from his own at the northeast corner of Uncle Darrell's and that King sat inside the driver's seat of the vehicle directly across from Davis. Davis testified that while speaking with someone, he saw a flash, heard a loud bang, and took cover on the opposite side of his vehicle. From there, he stated that he was able to see a person dressed in a dark hooded sweatshirt fire a gun into King's vehicle at close range several times and then walk across the street to the back of a nightclub named the 20/20 Club. Davis told the jury that after the shooter walked behind the 20/20 Club, Davis was able to identify Brown's car drive out from behind the nightclub and leave the scene.

Jerry Baker testified that he was working inside Uncle Darrell's on the night of the shooting. Baker stated he knew both Brown and King and spoke with King inside the store 20 to 30 minutes before the shooting took place. Baker explained to the jury that he heard four gunshots, and he ran to the front of the store to prevent his son from going outside. While standing at the front of the store, he witnessed a man in a dark hooded sweatshirt cross the street from Uncle Darrell's to the 20/20 Club.

Kevin Powell was another eyewitness to the shooting. Powell testified that he and several others were standing near the front of Uncle Darrell's adjacent to the east side of the building talking and smoking marijuana. Powell stated that he and King spoke briefly and then King drove off. Powell claims that King returned a few minutes later spinning his tires and playing loud music from his car stereo. Powell told the jury that King parked his vehicle near the northeast entrance of Uncle Darrell's such that Powell was then standing nearest the passenger side of King's vehicle. Powell testified that once King's car came to a stop and the smoke from the car's tires dissipated, Powell heard a gunshot and ducked down. Powell testified that as he looked through the passenger side window of King's vehicle, he saw the following: Brown stand next to King's driver's side window; King look up into Brown's aim; Brown shoot King; and, Brown pull the hammer back on a small black revolver, lean into the window, and shoot King a second time. Powell stated that Brown then placed the revolver into a dark hooded sweatshirt that he was wearing and walked away. Powell testified that earlier in the evening, Brown was wearing a lighter colored sweatshirt than the one he wore during the shooting. Powell also stated that Brown was wearing dark gloves when he shot King.

Jermaine Carter also witnessed the shooting that night. Carter testified that prior to the shooting, he and Sheena Puckett witnessed Brown changing clothes from the trunk of his vehicle near the 20/20 Club. Carter stated that moments before the

shooting, as Carter crossed the street from Uncle Darrell's to the 20/20 Club, he passed by Brown who was heading in the opposite direction. Carter described Brown as wearing a dark camouflage hooded sweatshirt and a camouflage mask that covered the lower half of his face. Carter stated that as he and Brown passed in the street between Uncle Darrell's and the 20/20 Club, he asked Brown what was going on, but Brown did not reply. Carter stated that shortly after he passed by Brown and proceeded toward the 20/20 Club, he heard a gunshot. Carter testified that he turned toward the noise and saw Brown standing near the driver's side window of King's vehicle firing a gun into it. Carter testified that after the shooting, Brown walked toward the 20/20 Club where Carter was standing and gestured for Carter to get into Brown's car. Carter claims that he drove Brown's car with Brown as a passenger from the scene of the crime and that Brown had him stop around the corner on First Street where Brown hid a small black revolver under a brush pile. Carter stated that after Brown hid the gun they continued down First Street. Near First and Hamley Street they almost got into an accident with another vehicle. In an effort to avoid the collision, Carter drove into a ditch alongside the road. Carter then testified that he fled the scene on foot once Brown's vehicle was towed from the ditch.

Sheena Puckett also witnessed the shooting. Puckett claims that she and Carter both witnessed Brown changing his clothes out of the trunk of Brown's vehicle from a light-colored hooded sweatshirt to a dark camouflage-colored hooded sweatshirt with a camouflage mask. Puckett noted that she recognized Brown even with the mask, because he had worn the same mask to a Halloween party at her house several days earlier. Puckett testified that she saw Carter approach Brown between Uncle Darrell's and the 20/20 Club, the two crossed paths in the street, and Brown told Carter, "Gone." Puckett described Brown as then approaching King's vehicle and shooting him through the driver's side window four times. Puckett fled the scene after the shooting but later returned to retrieve her cell phone and clean up a cut she had on her arm from climbing over a fence as she ran away. On cross-examination, Puckett admitted to having drunk a pint of vodka and smoking two marijuana blunts before witnessing the shooting. However, she testified that she was not impaired such that she could not remember what took place that night.

At the time of the shooting, Off. Roger Wilson was employed as the Assistant Chief of Police in Lake Providence, Louisiana. Officer Wilson testified that when he arrived on the scene at 11:23 p.m., he observed King's body sitting in a vehicle in front of Uncle Darrell's with a gunshot wound to the left side of the face. Officer Wilson told the jury that while taking photos at the crime scene, he found in King's car two cartridge casings which he placed in evidence bags after photographing them. One of the cartridge casings was found on King's shoulder and the other on the floor of the vehicle between the driver's seat and the door. Officer Wilson explained that once the Louisiana State Police arrived on the scene, he turned over the cartridge casings and his participation in the investigation was over. However, on cross

examination, Off. Wilson admitted that he did not turn the cartridge casings over to the state police at the scene but may have taken them back to the police station where they were placed in an evidence locker and then later turned over to the Louisiana State Police.

Dr. Frank Peretti performed the autopsy on King and testified as an expert in forensic pathology. Dr. Peretti stated that King died from three large caliber gunshot wounds to the head. Dr. Peretti indicated that the amount of unburned powder around one of the wounds on King's face indicated that the wound was caused by a shot fired approximately four inches away from King's face. Dr. Peretti testified that the lack of powder or "stippling" around the other two wounds indicated that they were likely caused by gunshots fired more than 20 inches from King's face.

Officer Todd Cummings of the Louisiana State Police was the lead investigator on the case. Officer Cummings testified that, with the help of Carter, he was able to locate a small black revolver hidden under a brush pile located near the scene of the shooting. Officer Cummings admitted that Carter was not initially truthful during the investigation and that Carter told investigators he fled the scene of the shooting on foot. However, after Off. Cummings confronted Carter with the fact that Off. Cummings had found Carter's driver's license near the area where Brown's car had driven into a roadside ditch, Carter changed his story and led police to the location of the revolver. Officer Cummings also testified that upon a search of the residence where Brown was rumored to be living, officers located a mask fitting the description, given by Puckett and Carter, of the mask worn by Brown during the shooting. The mask was found between a mattress and boxspring in the master bedroom of the house. Later, testimony by DNA analyst Doris Hoffpauir proved that Brown was the last person to have worn the mask.

Jeff Goudeau, the supervisor of the physical evidence unit at the Louisiana State Police Crime Lab, testified as an expert in ballistics and fingerprint processing. Goudeau explained the methods used to determine whether a particular cartridge casing was fired by a specific gun. Goudeau testified that he conclusively determined that the cartridge casings found on the victim's body were fired from the same gun that Off. Cummings recovered from the brush pile with the help of Carter. Goudeau testified that he had two theories as to how the cartridge casings were left at the scene. First, either the shooter removed the cartridge casings from the gun and left them at the scene or, second, the shooter had left the loading port on the revolver open, and after firing the revolver, the shooter pointed the gun upward, causing the cartridge casings to fall out of the gun. Goudeau also testified that the bullets recovered from King's head by Dr. Peretti were too badly damaged to conclusively determine whether they had been fired from the gun recovered from the brush pile.

*Id.* at 731-33.

22

Applying *Jackson*, the Second Circuit held, "Considering the evidence presented at trial in a light most favorable to the prosecution, we conclude that the state provided evidence sufficient to convict Brown of the second degree murder of King."  *Id.* at 733.  The court reasoned:

> No less than five people witnessed the killing of King. Many of the witnesses independently verified that Brown was the shooter. The description of the shooter, while varying slightly due to acceptable differences in perception, remained constant throughout the testimony of each eyewitness. Furthermore, witnesses repeatedly testified to having seen a black revolver used to kill King. Officer Cummings recovered a black revolver and it was determined by Goudeau as the weapon that fired the bullets from the casings found in King's car. Two witnesses described Brown as wearing a mask during the shooting and a mask fitting that description was found hidden in the home where Brown was staying. DNA analysis conclusively proved that Brown was the last person to have worn the mask.
>
> Defense counsel thoroughly cross-examined all witnesses and highlighted any alleged inconsistencies. The inconsistencies noted by defense counsel did not amount to drastic changes in testimony, but were more evident of slight differences in the ways in which questions were asked and answered. Although several of the witnesses were under the influence of drugs or alcohol when the shooting occurred, the impact of this fact is reduced considering that each witness gave a similar account of what occurred on the night November 12, 2008. The jury weighed the credibility of each witness and chose to believe the testimony of these witnesses. As stated above, a reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. There is nothing in the record that warrants this court's reversal of the jury's determinations.

*Id.* at 733-34 (internal citation omitted).

Here, a review of the state court record shows that the appellate court's application of *Jackson* was objectively reasonable.  This claim is without merit and should be **DENIED**.

H. Claim Eight: Ineffective Assistance of Counsel

Petitioner claims that his trial counsel rendered ineffective assistance by failing to investigate and question key witnesses, failing to call an important witness, and failing to object to the prosecutor's closing argument.  [doc. # 1-1, p. 29].

To prevail on a claim of ineffective assistance of counsel, a petitioner must show that his counsel's actions fell below an objective standard of reasonableness and that the ineffectiveness of counsel prejudiced him.  *Strickland v. Washington*, 466 U.S. 668, 686-87 (1984).  If the petitioner does not make a sufficient showing as to one prong of the test, the other prong need not be considered.  *Tucker v. Johnson*, 115 F.3d 276, 281 (5th Cir. 1997).  The prongs of the test need not be analyzed in any particular order.  *Goodwin v. Johnson*, 132 F.3d 162, 172 n.6 (5th Cir. 1997).  Further, "mere conclusory allegations in support of a claim of ineffective assistance of counsel are insufficient to raise a constitutional issue."  *Green v. Johnson*, 160 F.3d 1029, 1042-43 (5th Cir. 1998).

When applying the first prong of *Strickland*, federal courts do not second-guess the attorney's decision from the distorting perspective of hindsight; rather, they presume that the attorney's actions are encompassed within the wide range of reasonable competence and fall under the ambit of trial strategy.  *See Strickland*, 466 U.S. at 689-90.  The burden, therefore, is on the petitioner to show that counsel's representation fell "outside the wide range of professionally competent assistance."  *Id.* at 690; *Ward v. Whitley*, 21 F.3d 1355 (5th Cir. 1994).  In other words, the petitioner must demonstrate that counsel's representation was objectively unreasonable.  *Strickland*, 466 U.S. at 688.

To establish prejudice, the second prong, the petitioner "must show that there is a

reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. "That requires a substantial, not just conceivable, likelihood of a different result." *Cullen*, 131 S. Ct. at 1403 (internal quotation marks and citation omitted). Stated differently, a petitioner must demonstrate that counsel's actions "were so serious as to render the proceedings unreliable and fundamentally unfair." *U.S. v. Saenz-Forero*, 27 F.3d 1016, 1021 (5th Cir. 1994); *Murray v. Maggio*, 736 F.2d 279 (5th Cir. 1984). Unreliability and unfairness do not result "if the ineffectiveness of counsel does not deprive the defendant of any substantive or procedural right to which the law entitles him." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993).

    Finally, when review is governed by the AEDPA, review of the state court's resolution of the ineffective assistance of counsel claim is "doubly deferential," *Knowles v. Mirzayance*, 556 U.S. 111, 112 (2009), since the question is "whether the state court's application of the *Strickland* standard was unreasonable." *Harrington v. Richter*, 131 S. Ct. 770, 785 (2011). Importantly, "[t]his is different from asking whether defense counsel's performance fell below *Strickland's* standard," because the "state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself." *Id.* Consequently, "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 786. To obtain relief, a petitioner must show that the state court's ruling on the claim was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 786-87. "The question is whether there is any reasonable argument that counsel satisfied *Strickland's*

25

deferential standard." *Id.* at 788.

i. Failure to Investigate Witnesses

Petitioner first argues, "Trial counsel was aware of several witnesses that gave statements to police, and knew their names, but he never interviewed them." [doc. # 1-1, p. 30]. He argues further: "It is entirely possible that these witnesses [saw] the actual crime and perpetrator. At the least, they may have been able to provide information that would assist . . . [the] defense through impeachment of the witnesses the State did call." *Id.* at 31. Petitioner identifies the witnesses as Joseph Jefferson, Ettrick Dewayne Smith, and Angela Denise Williams. *Id.*

"[A]n attorney must engage in a reasonable amount of pretrial investigation and 'at a minimum, . . . interview potential witnesses and . . . make an independent investigation of the facts and circumstances in the case." *Bryant v. Scott*, 28 F.3d 1411, 1415 (5ᵗʰ Cir. 1994) (citing *Nealy v. Cabana*, 764 F.2d 1173, 1177 (5ᵗʰ Cir. 1985)). "[C]ounsel's investigation does not have to uncover every conceivable fact to be reasonable." *Williams v. Stephens*, 575 Fed. App'x 380, 385 (5ᵗʰ Cir. 2014) (citation omitted). When assessing the reasonableness of an attorney's investigation, a court must "consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Miller v. Dretke*, 420 F.3d 356, 361 (5ᵗʰ Cir. 2005) (quoting *Wiggins v. Smith*, 539 U.S. 510, 521 (2003)). A petitioner must allege with specificity what the investigation would have revealed and how it would have changed the outcome of the trial. *Id.* at 361.

Here, Petitioner does not state what the witnesses would have communicated had counsel interviewed them. In fact, he equivocates and indicates that the three individuals *may* have

witnessed the crime.  The Court cannot conclude, from Petitioner's speculative and unsupported

claim, that counsel was ineffective in choosing not to interview the three proposed witnesses.

       ii. <u>Failure to Call a Witness</u>

     Petitioner claims that counsel failed to call "the man who owned the mask used in the

crime, and who would have testified as to whom the mask was loaned out to just prior to the

crime being committed."  [doc. # 1-1, p. 30].  Petitioner goes on, "Counsel knew that Travis

Brown would have testified that the mask used in evidence by the State was his mask, and that he

had allowed another person to use the mask on the day before the murder of Mr. King."  *Id.* at 32.

In fact, Petitioner claims that Travis Brown was present in court during trial and expected to be

called to testify.  *Id.*

     Claims of uncalled witnesses are not favored in federal *habeas corpus* review because the

presentation of testimonial evidence is a matter of trial strategy and allegations of the content of a

prospective witness's testimony are largely speculative.  *Sayre v. Anderson*, 238 F.3d 631, 635-36

(5th Cir. 2001) (citing *Lockhart v. McCotter*, 782 F.2d 1275, 1282 (5th Cir. 1986)).  "[W]ithout a

specific, affirmative showing of what the missing evidence or testimony would have been, a

habeas court cannot even begin to apply *Strickland's* standards because it is very difficult to

assess whether counsel's performance was deficient, and nearly impossible to determine whether

the petitioner was prejudiced by any deficiencies in counsel's performance."  *Anderson v. Collins*,

18 F.3d 1208, 1221 (5th Cir. 1994).  A petitioner must show not only that a witness's testimony

would have been favorable, but also that the witness would have, in fact, testified at trial.  *See*

*Alexander v. McCotter*, 775 F.2d 595, 602 (5ᵗʰ Cir. 1985); *Boyd v. Estelle*, 661 F.2d 388, 390 (5ᵗʰ Cir. 1981).

At trial, after the defense rested and the State elected not to present any rebuttal, Petitioner's counsel attempted to call Travis Brown as a witness.  [doc. # 12-11, p. 71].  Counsel informed the trial judge that the "premise of [the witness's] testimony was gonna [sic] be that he owns the mask that was in question, contrary to what the trooper had testified to yesterday . . . ."  The trial judge denied counsel's attempt to reopen the case.  [doc. # 12-11, p. 72].

While counsel's failure to call the witness prior to the close of the proceeding is indeed troubling, given that counsel intended to call the witness,[8] the Court cannot conclude that, but for counsel's alleged error, the result of the proceeding would have been different.  Counsel's statements at trial do indicate that the witness would have testified; however, Petitioner fails to provide an affidavit or other credible evidence from the proposed witness that affirmatively demonstrates the content of the witness's testimony.  *See Gray v. Epps*, 616 F.3d 436, 443 (5ᵗʰ Cir. 2010) (denying an ineffective assistance claim because the petitioner failed to produce affidavits from the witnesses); *Harrison v. Quarterman*, 496 F.3d 419, 428 (5ᵗʰ Cir. 2007) ("Ordinarily, a defendant's failure to present some evidence *from the uncalled witness* regarding that witness's potential testimony . . . would be fatal . . . .").  Instead, Petitioner simply offers speculation regarding the content of the possible testimony.  *See U.S. v. Cockrell*, 720 F.2d 1423,

---

[8] The record indicates that defense counsel had some difficulty locating and identifying the witness.  For instance, counsel informed the court that he subpoenaed the witness and placed his name on the witness list, but the witness "had been coming in and out" of the courtroom because he maintained two jobs.  [doc. # 12-11, p. 73].  The judge remarked, "And there was an effort  made . . . to find him this morning, and he was not found all morning."  *Id.*  Counsel then stated that although the witness appeared after lunch, counsel "didn't know his identity."  *Id.*

1427 (5ᵗʰ Cir. 1983) (viewing ineffective assistance claims with "great caution" when the only evidence of missing testimony is from the defendant).  Absent any concrete evidence of what the witness would have testified to, the Court cannot conclude that there is a reasonable probability that, had the witness testified, the outcome of the trial would have differed.[9]

### iii. Failure to Object to Closing Argument

Petitioner claims, in conclusory fashion, that counsel failed to object when the prosecutor argued during closing argument that Petitioner carried the burden of proof.[10]  [doc. # 1-1, p. 30].  Petitioner, however, does not elaborate, and he fails to cite to any specific portion of the record that might illuminate a deficiency in counsel's performance.  This conclusory claim does warrant relief.[11]  *See Green*, 160 F.3d at 1042-43; *Uresti v. Lynaugh*, 821 F.2d 1099, 1103 (5ᵗʰ Cir. 1987) (holding that a *habeas* petitioner has the burden of proving facts in support of his or her claim and unsupported, conclusory allegations do not warrant relief).

Petitioner also claims, again in conclusory fashion, that counsel failed to object when the prosecutor improperly vouched for the credibility of witnesses.  [doc. # 1-1, p. 30].  He contends, in particular, that counsel should have objected when the prosecutor referred to one witness as

---

[9] Even crediting counsel's version of what the witness would have testified to, the Court cannot conclude that, but for counsel's alleged error, the jury would have rendered a different verdict.  According to counsel, the witness would have testified that he, rather than Petitioner, owned the mask in question.  [doc. # 12-11, p. 72].  This testimony, however, would only tend to establish that Petitioner did not own the mask; it would not establish that Petitioner did not wear the mask when the crime occurred.

[10] Contrary to Petitioner's claim, the prosecutor informed the jury that the "State of Louisiana has the burden of proof."  [doc. # 12-11, p. 77].

[11] The Court conducted an independent review of the prosecutor's closing argument and found no instances of constitutionally improper conduct.

his hero.  *Id.* at 34.   At trial, in his rebuttal to defense counsel's closing argument, the prosecutor

argued the following:

> Now, the other heroes in this case, our witnesses.

> * * *

> And Mr. Busari says, ah, they're not credible.

> * * *

> They're my heroes.

> * * *

> They're my heroes.  And they did it even though they're scared.  Because they gotta
> [sic] go back to the streets when we go home.  They're my heroes.  Finally, my third
> hero.  And Mr. Busari has done a great job this week.  He's a great advocate.  But let
> me tell you my third hero is Jermaine Carter.

> * * *

> My hero, the eighteen year old kid, Marico Jermaine Carter.

[doc. # 12-11, p. 110-112].

Counsel did not render deficient performance in choosing not to object to these

comments.  First, "A decision not to object to a closing argument is a matter of trial strategy."

*Drew v. Collins*, 964 F.2d 411, 423 (5th Cir. 1992).  Second, a prosecutor may permissibly vouch

for the credibility of a witness if the defense previously attacked the credibility of the witness.

*U.S. v. Washington*, 44 F.3d 1271, 1278 (5th Cir. 1995) (holding that the government may present

bolstering arguments in rebuttal to assertions by the defense); *see U.S. v. Young*, 470 U.S. 1, 12

(1985) (instructing courts reviewing a prosecutor's remarks to determine whether the defense

invited the remarks).  Here, Petitioner's counsel attempted to impugn the credibility of several

witnesses; in fact, after mentioning the names of several witnesses, counsel implored the jury to remember, "Though shalt not be a false witness against another."  [doc. # 12-11, p. 98-99].  The prosecutor's response to those comments was not improper.

Because the prosecution did not commit any misconduct,[12] Petitioner's counsel did not render ineffective assistance by failing to object to the prosecution's closing argument.  Stated differently, any objection to the prosecutor's remark would have been groundless.  *See Koch v. Puckett*, 907 F.2d 524, 527 (5th Cir. 1990) (making clear that counsel is not required to assert futile motions or objections).  This permutation of Petitioner's claim is meritless.[13]

Finally, Petitioner claims that counsel should have objected when the prosecutor improperly mentioned Petitioner's out-of-court statements.  [doc. #s 1-1, p. 33; 12-11, p. 94]. The prosecutor's remarks, however, were not improper.  "A defendant's own statement is not hearsay."  *State v. Greenberry*, 154 So. 3d 700, 708 (La. App. 4 Cir. 2014).  Thus, counsel cannot be faulted for choosing not to object.  That aside, the Court also observes that Petitioner fails to articulate how the prosecutor's comments infected his trial with unfairness.  Even assuming the prosecutor's statements were improper and that counsel did err by failing to object, the error did not affect the outcome of the trial.  In other words, even if counsel did object and the judge

---

[12] In fact, the Louisiana Code of Criminal Procedure provides: "[t]he state's rebuttal shall be confined to answering the argument of the defendant."  LA. C. CR. P. art. 774.  In other words, "the State has the right to answer the argument of the defendant.  *State v. Thomas*, 572 So. 2d 681, 684 (La. App. 1 Cir. 1990).

[13] Even assuming the prosecutor's remarks were improper, Petitioner has not demonstrated, considering the strength of the evidence against him and the trial court's directive to the jurors that "you alone shall determine the weight and credibility of the evidence," that the remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  [*See* doc. # 12-11, p. 114]; *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).

sustained the objection, and even if counsel then requested a curative instruction, there is no reasonable probability that the jury would have returned a different verdict.  This claim is without merit.

Petitioner fails to overcome the deference owed to the state *habeas* court.  He has not shown that the court's denial of the aforementioned ineffective assistance of counsel claims constituted an error beyond any possibility for fairminded disagreement.  These claims should be **DENIED**.

**<u>Conclusion</u>**

For the reasons stated above, **IT IS RECOMMENDED** that the Petition for *habeas corpus* filed by Petitioner Larry R. Brown, [doc. # 1], be **DENIED and DISMISSED WITH PREJUDICE**.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule 72(b), parties aggrieved by this Recommendation have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within **fourteen (14) days** after being served with a copy of any objections or response to the District Judge at the time of filing.  A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR,**

**FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

Pursuant to Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts, this Court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant.  Unless a Circuit Justice or District Judge issues a certificate of appealability, an appeal may not be taken to the court of appeals.  **Within fourteen (14) days from service of this Report and Recommendation, the parties may file a memorandum setting forth arguments on whether a certificate of appealability should issue.**  *See* 28 U.S.C. § 2253(c)(2).  **A courtesy copy of the memorandum shall be provided to the District Judge at the time of filing.**

In Chambers, Monroe, Louisiana, this 28th day of May, 2015.

KAREN L. HAYES
UNITED STATES MAGISTRATE JUDGE